**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

THE UNIVERSITY OF FLORIDA
COLLEGE REPUBLICANS,

      Plaintiff,

v.                                                                      CASE NO.: 1:26-cv-00063

DONALD LANDRY, President
of the UNIVERSITY OF FLORIDA,
in his official capacity,

      Defendant.

_____/

## PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, University of Florida College Republicans ("UFCR" or

"Plaintiff"), respectfully files this Reply in support of its Motion for

Preliminary Injunction, ECF No. 7, and states:

### INTRODUCTION

Defendant's Opposition confirms why preliminary relief is necessary.

UF publicly deactivated Plaintiff after controversy surrounding allegedly

"antisemitic" expression and publicly justified that action by invoking

Plaintiff's supposed "conduct," "values," and the University's commitment

to combating antisemitism. Only after suit was filed did Defendant attempt

to recast the deactivation as the routine enforcement of neutral rules

1

regarding chapter affiliation and state-law use of the word "Republican."

That post hoc reframing does not cure the constitutional problem.

UF makes two primary arguments—both of them fail.  UF states that

it deactivated UFCR because it "violated" two guidelines:

> **a.** Violation of University statutes, rules, policies, and
> procedures, and/or state, federal, or local law.
> …
> **d.** The national, regional, or state organization revokes
> organization's charter or denies affiliation.

UF fails however, to show how UFCR "violated" any state law, and it fails

to show that UFCR was part of a supposed  "state organization" such as

FFCR.

The First Amendment forbids a public university from burdening a

student political organization because officials disapprove of perceived

viewpoints or because outside pressure demands that result. *Healy v. James*,

408 U.S. 169, 187–88 (1972); *Rosenberger v. Rector & Visitors of Univ. of Va.*,

515 U.S. 819, 829 (1995). That is what happened here. UF stripped Plaintiff

of official recognition and the core incidents of campus participation—

facilities access, event-hosting privileges, communications channels, and

funding eligibility—based on controversy over protected political

expression and a request by an outside entity, FFCR, that has no lawful

power to dictate whom UF may recognize. Defendant's new reliance on

2

charter revocation and Florida Statute § 103.081 is a transparent litigation position, not the contemporaneous basis for the University's action.

Defendant's remaining arguments fare no better. The loss of recognition and access to university channels is itself a classic First Amendment injury under *Healy*, and the ongoing exclusion of Plaintiff from the campus forum is irreparable. The balance of equities and public interest overwhelmingly favor protecting constitutional rights. And the requested injunction restores, rather than disturbs, the last lawful status quo: Plaintiff's recognized status before UF deactivated it on March 13, 2026.

The motion for a preliminary injunction should be granted.

## **ARGUMENT**

### I. PLAINTIFF HAS SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

Defendant's Opposition does not rebut Plaintiff's central showing: UF deactivated Plaintiff because of controversy over protected expression and because UF accepted and acted upon FFCR's request that Plaintiff be removed and later "reactivated . . . under new student leadership." That is viewpoint-based burdening of speech and association, not neutral administration.

### A. Defendant's own contemporaneous statements reveal viewpoint-based motivation.

3

Defendant insists UF acted only because FFCR revoked Plaintiff's charter and because Plaintiff supposedly could not lawfully use the word "Republicans." But the University's own public statement says otherwise. UF announced that FFCR requested deactivation based on findings that some members engaged in conduct violating FFCR's "rules and values," including "a recent antisemitic gesture." UF then emphasized its support for the Jewish community and stated it remained committed to addressing antisemitism and other forms of discrimination and harassment. Only after invoking those viewpoint-laden reasons did UF assert, in conclusory fashion, that it was acting "[i]n compliance with its policies."

That contemporaneous explanation matters. Defendant cannot erase the constitutional significance of the University's public justification by submitting a later declaration that characterizes the same decision differently. At the preliminary-injunction stage, the Court need not blind itself to what the University actually said when it acted. Those statements show that the deactivation was motivated in substantial part by hostility to perceived viewpoints and by controversy over protected expression.

That is unconstitutional. In *Healy*, the Supreme Court held that a public college could not deny recognition to a student group based on disagreement with its philosophy or fears arising from association rather than actual, lawful grounds for discipline. 408 U.S. at 187–88.

4

In *Rosenberger*, the Court reaffirmed that viewpoint discrimination is an "egregious form of content discrimination." 515 U.S. at 829. And in *Papish v. Bd. of Curators of Univ. of Mo.*, the Court made clear that the dissemination of ideas on a state university campus may not be shut off merely because officials regard them as offensive. 410 U.S. 667, 670 (1973).

Defendant's Opposition never meaningfully grapples with those principles. Instead, it asks the Court to accept that a public university may publicly tie deactivation to alleged antisemitism, invoke a private group's disapproval of the organization's "rules and values," and request reorganization under "new student leadership," yet still be deemed viewpoint-neutral because counsel can now identify after-the-fact regulatory hooks. The First Amendment requires more than that.

**B. UF cannot evade the First Amendment by outsourcing deactivation authority to FFCR.**

Defendant's theory depends on the premise that FFCR's "revocation" of Plaintiff's charter effectively compelled deactivation. But that premise is constitutionally and factually flawed.

First, FFCR is a private, outside organization. It is not the University. It is not the State. And it does not possess sovereign authority to decide which student organizations a public university may recognize. If UF chose to act because FFCR demanded that Plaintiff be removed, that does not render the decision viewpoint-neutral; it confirms that the State burdened

5

Plaintiff's rights at the urging of a private third-party hostile to Plaintiff's expression.  Worse, FFCR was not an organization that UFCR was part of. The Constitution of UFCR makes no mention of FFCR, and the President of UFCR declares under penalty of perjury it was never part of that "organization."  **See Exhibits 1 and 4.**  UF fails to respond as to why FFCR is totally absent from the Constitution of UFCR.  Other student clubs make express mention of any "affiliated organization."  For example, in the Constitution of the UF College Democrats, the first paragraph states:

> College Democrats is affiliated with the Florida College Democrats.

**See Exhibit 2,** Constitution of the UF College Democrats.  No such statement is contained with the Constitution of the UF College Republicans.

Second, Defendant's own public statement shows that UF was not mechanically applying a ministerial rule. UF did not simply say Plaintiff lacked an administrative prerequisite. It said FFCR's request was "based on" Plaintiff members' allegedly antisemitic conduct and that UF supported FFCR's action in addressing conduct "antithetical to its principles." That is not neutral administration. It is endorsement and implementation of a speech-based demand.

Third, FFCR has no authority over Plaintiff.  FFCR had no authority over or affiliation with UFCR. Defendant unconvincingly relies on 9 year

6

old historic materials and to falsely argue otherwise. At minimum, that dispute cannot be resolved against Plaintiff on the present record, particularly where the University acted immediately, without meaningful process, and then publicly framed the action in viewpoint terms. **See Exhibits 1 and 4.**

The Court need not definitively resolve every historical question about Plaintiff's relationship with FFCR to grant preliminary relief. It is enough that Plaintiff has shown a substantial likelihood that UF acted in response to controversy over protected expression and delegated decisive weight to the demand of a private entity seeking to silence or restructure Plaintiff because of perceived viewpoints.

**C. Defendant's reliance on Florida Statute § 103.081, a facially unconstitutional law due to its overbreadth, is a post hoc justification, not a neutral basis that defeats Plaintiff's claims.**

Defendant's new statutory argument is likewise unpersuasive. According to the Opposition, once FFCR revoked Plaintiff's charter, UF was required to deactivate Plaintiff because Plaintiff could no longer "lawfully use" the name of the Republican Party under § 103.081(2), Florida Statutes. That argument suffers from multiple defects.

First, Florida Statute § 103.081, is facially unconstitutional law due to its overbreadth.  § 103.081, Fla. Stat. provides:

(2)   No person or group of persons shall use the name, abbreviation, or symbol of any political party, the name, abbreviation, or symbol of which is filed with the Department of State, in connection with any club, group, association, or organization of any kind unless approval and permission have been given in writing by the state executive committee of such party...

This statute, part of Florida's Election Code, is contained in Title IX of the Florida Statutes (Chapters 97–106), and assigns a *misdemeanor* criminal penalty for any violation:

104.41   Violations not otherwise provided for.—Any violation of this code not otherwise provided for is a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

A First Amendment violation for overbreadth occurs when a law prohibits a substantial amount of protected speech and does so in addition to any unprotected speech it legitimately targets.  Clearly, a law stating that any use of the term "republican" without permission is punishable by up to a year in jail, is farcically overbroad.  This court declare that such a provision, facially overbroad, plainly unconstitutional, and its use pretextual in this context.  But even if this Court decides not to make such a finding, Florida Statute § 103.081 does not apply in nearly the way that UF states it does. See **Exhibit 3**, a Declaration by the Chairman of the Republican Party of Florida, providing that:

"That [FFCR's] charter does not include a delegation of authority to enforce the rules of the party regarding what person or group of persons are permitted to use the

8

"Republican" name. Such authority belongs solely to the RPOF."

(Declaration of Chairman Evan Power, **Exhibit 3**)

Second, it was not the contemporaneous basis communicated to Plaintiff. The deactivation email cited the status of the chapter "within its governing organization." It did not state that Plaintiff was violating § 103.081, identify any written demand from the Republican Party of Florida directed to Plaintiff, or explain that UF had determined Plaintiff's name was unlawful under state law. The University's public statement likewise centered on FFCR's findings about allegedly antisemitic conduct and its request that UF deactivate Plaintiff while FFCR reorganized the chapter under new leadership. The statutory rationale surfaced later, in litigation.

Third, the statute does not give a public university license to burden protected association and speech through selective enforcement or pretextual invocation. Plaintiff alleges that UF has allowed other groups to remain recognized despite controversial or offensive expression by members, and that UF had not previously enforced any supposed prohibition in this manner. Defendant's only response is to cite one recent example of another organization allegedly deactivated after charter revocation. That isolated assertion does not eliminate the substantial evidence of pretext present here, particularly given UF's contemporaneous statements and the overt focus on Plaintiff's alleged viewpoints.

9

Fourth, even if the statute may bear on the permissible use of a political party's name, that does not authorize the University to strip Plaintiff of official status on a viewpoint-based record. If the University believed Plaintiff needed to modify its name or document authorization, it could have pursued a narrow, content-neutral administrative remedy. Instead, it deactivated Plaintiff outright, publicly tied that action to alleged antisemitism, and endorsed a private organization's effort to reorganize Plaintiff under new student leadership. That is not narrow tailoring. It is punitive suppression.

Finally, Defendant's argument proves too much. On Defendant's view, the University may immediately deactivate a student political organization, without meaningful process, whenever an outside group claims authority to withdraw affiliation and disputes the organization's right to use a political label. That framework would allow public universities to burden campus political association based on external factional disputes and controversial expression, precisely where First Amendment scrutiny should be at its highest. The Constitution does not permit such a result.

**D. Plaintiff's speech and associational claims remain strong under Healy, Papish, and Mahanoy.**

Defendant's Opposition does not overcome the governing First Amendment framework set forth in Plaintiff's Motion.

The relevant expression was off-campus political speech. Plaintiff's verified filings allege that it did not constitute a true threat, incitement, or other unprotected category of speech. Under *Mahanoy Area Sch. Dist. v. B. L.*, schools have diminished authority over off-campus expression, especially where political speech is involved. 594 U.S. 180, 188–91 (2021). Defendant has not shown otherwise.

Nor has Defendant identified a material and substantial disruption sufficient to justify punishing Plaintiff under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). Instead, Defendant relies on allegations of offensive expression, reputational concerns, and asserted incompatibility with FFCR's values. That is not enough.

And *Christian Legal Society v. Martinez* does not help Defendant. 561 U.S. 661 (2010). That case involved an all-comers policy that the Supreme Court found reasonable and viewpoint-neutral on the record there. Here, by contrast, Plaintiff challenges a deactivation carried out amid viewpoint controversy, justified in contemporaneous public statements by reference to alleged antisemitism and private organizational values, and only later defended through post hoc legal theories. *Martinez* reaffirmed, rather than diminished, the rule that recognition programs must be administered under constitutionally valid, viewpoint-neutral standards. Id. at 679–83. Plaintiff is likely to show UF failed that test.

11

For the same reasons, Plaintiff is likely to succeed on its expressive-association and retaliation claims. A public university may not deny or withdraw recognition from a student political group because of protected expression or because officials seek to pressure that group into new leadership and ideological conformity. That burdens association directly and imposes an unconstitutional condition on access to campus benefits. *Healy*, 408 U.S. at 181–84.

## II. PLAINTIFF HAS SHOWN IRREPARABLE HARM.

Defendant's argument that Plaintiff suffers no irreparable harm because it may still speak as an unregistered student group misunderstands *Healy* and the nature of the injury.

The loss of official recognition is not trivial. It excludes Plaintiff from the ordinary channels through which student organizations participate in campus life: recognized access to facilities, event-hosting privileges, university communications systems, funding eligibility, and the institutional legitimacy necessary to recruit, organize, and advocate effectively. *Healy* recognized that denial of recognition burdens associational rights precisely because it impairs a student group's ability to exist and function on campus. 408 U.S. at 181–84. Defendant cannot reduce that constitutional injury to a mere inconvenience by pointing out that Plaintiff may still attempt to meet in diminished form.

Nor is it an answer to say that Plaintiff held meetings after deactivation. The First Amendment does not require a student political organization to prove total silence before it may obtain relief. The question is whether the State has burdened protected speech and association in a way that causes ongoing, noncompensable injury. It plainly has. Plaintiff has lost recognized status and the accompanying rights and benefits that make participation in the campus marketplace of ideas meaningful and effective. Every day that deactivation remains in place, Plaintiff loses organizing opportunities, speaking opportunities, recruitment opportunities, and the practical benefits of recognized membership in the university forum. Those losses cannot be fully restored after final judgment.

Defendant's reliance on *Siegel v. LePore* does not change that conclusion. 234 F.3d 1163 (11th Cir. 2000). *Siegel* itself recognized that certain First Amendment claims involving imminent chill or prevention of pure speech may warrant a presumption of irreparable injury. Id. at 1177–78. This case fits comfortably within that principle. Plaintiff has shown an ongoing deprivation of First Amendment-protected campus access and recognition-based expressive channels. Moreover, *Elrod v. Burns* remains clear that the loss of First Amendment freedoms, even for minimal periods, constitutes irreparable injury. 427 U.S. 347, 373 (1976).

Defendant also argues that Plaintiff may simply reapply for RSO status or rename itself. That argument only underscores the burden. The First Amendment does not permit the University to force a political organization to forfeit its established identity, alter its associational character, or reapply from scratch as the price of exercising constitutional rights. A coerced change in name, affiliation, or organizational posture is itself a burden on speech and association, not a cure for it.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR RELIEF.

Where the government is the opposing party, the balance of harms and public interest merge. *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020). Both factors favor Plaintiff.

Plaintiff faces ongoing loss of First Amendment rights. That harm is substantial and irreparable. Defendant, by contrast, identifies no cognizable harm from temporary reinstatement other than the asserted burden of recognizing Plaintiff while this case proceeds. But preserving constitutional freedoms is not a legally cognizable injury to the State. And Defendant's assertion that reinstatement would force UF to facilitate a violation of Florida law depends on the same disputed, post hoc statutory theory discussed above. That theory does not outweigh Plaintiff's immediate constitutional injury.

14

Nor would an injunction harm the public interest. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Scott v. City of Daytona Beach*, 689 F. Supp. 3d 1160, 1185 (M.D. Fla. 2023). The public has a strong interest in ensuring that public universities remain places of robust political debate, not sites where officials silence disfavored viewpoints through private pressure, selective enforcement, or administrative pretext.

## IV. THE REQUESTED INJUNCTION RESTORES THE STATUS QUO ANTE.

Defendant emphasizes that reinstatement is "mandatory" relief. Even if the Court applies a heightened formulation, Plaintiff satisfies it. The law and facts clearly favor relief.

In any event, Defendant misstates the relevant status quo. The last peaceable, non-wrongful status was Plaintiff's recognized status before UF deactivated it on March 13, 2026. An injunction restoring that status does not create a new arrangement; it preserves the position Plaintiff occupied before the challenged constitutional violation. Courts routinely recognize that reinstatement may be appropriate where necessary to prevent ongoing irreparable harm from an allegedly unlawful suspension, termination, or deactivation.

Here, denying relief would not preserve neutrality. It would preserve the consequences of the challenged constitutional violation for the duration of the litigation. The Court should decline that invitation.

## CONCLUSION

Plaintiff has shown a substantial likelihood of success on its First Amendment claims, irreparable harm absent relief, that the balance of equities tips sharply in its favor, and that an injunction serves the public interest. Defendant's Opposition rests on post hoc justifications that do not erase the University's contemporaneous, viewpoint-based rationale for deactivating Plaintiff.

For those reasons, Plaintiff respectfully requests that the Court grant its Motion for Preliminary Injunction, declare that  Florida Statute § 103.081 is unconstitutionally overbroad, order Defendant to immediately reinstate Plaintiff as a recognized student organization in good standing during the pendency of this action, restore all recognition-based benefits, waive bond or require only nominal security, and grant such further relief as the Court deems just and proper.

**Dated**: April 6, 2026.

Respectfully submitted,

/s/ Anthony F. Sabatini
ANTHONY F. SABATINI
Florida Bar No. 1018163

16

anthony@sabatinilegal.com
SABATINI LAW FIRM, P.A.
1601 E. 1st Ave.
Mount Dora, Florida 32757
Telephone: (352) 455-2928

Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on 4.6.2026, I electronically filed the

foregoing with the Clerk of Court by using the CM/ECF system.

/s/ *Anthony F. Sabatini*

17

# Constitution of the College Republicans
## 2024-2025 EXECUTIVE BOARD

ARTICLE I. NAME OF ORGANIZATION

ARTICLE II. ORGANIZATION AFFILIATION

ARTICLE III. PURPOSE STATEMENT

ARTICLE IV. COMPLIANCE STATEMENT & UNIVERSITY REGULATIONS

ARTICLE V. MEMBERSHIP

ARTICLE VI. BYLAWS FOR COLLEGE REPUBLICANS

ARTICLE VII. STUDENT ORGANIZATION ADVISOR

ARTICLE VIII. OFFICERS

ARTICLE IX. ELECTIONS

ARTICLE X. FINANCE

ARTICLE XI. AMENDMENTS TO CONSTITUTION

ARTICLE I. NAME OF ORGANIZATION

The name of this organization is the College Republicans. This organization will utilize the acronym CRs in all publicity materials and correspondence.

ARTICLE II. ORGANIZATION AFFILIATION

As outlined in the RSO Classification Policy, College Republicans is considered a General Registered Student Organization. As a GRSO, our organization is a separate 3rd party entity, not considered a part of the University of Florida. Through registering with the University, our student group agrees to follow its policies and operate on campus with access and/or eligibility for specific campus benefits.

ARTICLE III. PURPOSE STATEMENT

The purpose of this club shall be to promote the principles of the a conservative Republican Party among the students of the University of Florida, to increase the membership in the club and in the Republican Party, to provide a forum for discussion and growth of the Republican Party, to provide service to the Republican Party at all levels, to aid in the election of Republican candidates at all levels of government, and to develop strong leadership abilities and political skills among Republican students as preparation for future service to the Republican party and to the United States of America.

ARTICLE IV. COMPLIANCE STATEMENT & UNIVERSITY REGULATIONS

Upon approval by the Department of Student Engagement, College Republicans shall be a registered student organization at the University of Florida. College Republicans shall comply with all local, state and federal laws, as well as all University of Florida regulations, policies, and procedures. Such compliance includes but is not limited to the University's regulations related to Non-Discrimination, Sexual Harassment (including sexual misconduct, dating violence, domestic violence, and stalking), Hazing, Commercial Activity, and Student Leader Eligibility.

Section A. Non-Discrimination

College Republicans agrees that it will not discriminate on the basis of race, creed, color, religion, age, disability, sex, sexual orientation, gender identity and expression, marital status, national origin, political opinions or affiliations, genetic information and veteran status as protected under the Vietnam Era Veterans' Readjustment Assistance Act. Discrimination on the basis of the protected classes described in University of Florida Regulation 1.006 (Non-Discrimination/Harassment/Invasion of Privacy Policies) is prohibited.

Section B. Sexual Harassment

College Republicans agree that it will not engage in any activity that is unwelcome conduct of sexual nature that creates a hostile environment. Behaviors that could create a hostile environment include sexual harassment, which could include inappropriate sexual comments, and/or sexual misconduct on the basis of sexual orientation or gender identity, dating violence, domestic violence, stalking, and repeated

instances of cyber abuse. Sexual harassment as described in University of Florida Regulation 1.006 (Non-Discrimination/Harassment/Invasion of Privacy Policies) is prohibited.

Section C. Hazing

College Republicans agrees that it will not initiate, support, or encourage any events or situations that recklessly, by design, or intentionally endanger the mental or physical health or safety of a student for any purpose including but not limited to initiation or admission into or affiliation with any student group or organization. Hazing as defined in University of Florida Regulations 1.0081 (Prohibition of Hazing; Procedures and Penalties) and 4.040 (Student Honor Code and Student Conduct Code) is prohibited. If found responsible for hazing, sanctions may be imposed against the organization, its leaders and/or its members.

Section D. Responsibility to Report

The University of Florida identifies Responsible Employees and Campus Security Authorities to support the health, safety, and wellbeing of campus. If College Republicans becomes aware of any such conduct described in this article, they are encouraged to report it immediately to staff in Student Engagement, the Director of Student Conduct and Conflict Resolution, the University's Title IX Coordinator, or to their Student Organization Advisor, who are identified as mandated reporters.

Section E. Officer Eligibility

College Republicans understands, acknowledges, and agrees to uphold and abide by the specific minimal requirements regarding officer eligibility as defined in the Registered Student Organization Classification and Officer Eligibility Policy.

ARTICLE V. MEMBERSHIP

Membership in this organization is open to all enrolled students at the University of Florida. Non-enrolled students, spouses, faculty, and staff are prohibited from holding membership, office or voting powers. All members are free to leave and disassociate without fear of retribution, retaliation, or harassment.

ARTICLE VI. BYLAWS FOR COLLEGE REPUBLICANS

College Republicans may elect to maintain separate bylaws document to outline the day-to-day operations of the organization and to clarify policies and procedures otherwise not included in the previous articles. Bylaws and/or other guiding documents may not take precedence over the requirements sent forth by local, state, and federal laws, the university of Florida's regulations, policies, and procedures, and the Student Engagement constitution requirements. Amendments and changes may be made to the bylaws and shall be consistent with the Student Engagement approved constitution on file and student engagement's constitution requirements. Should the organization transition leadership, all bylaws and

guiding documents will be transitioned to new student organization leaders and/or advisor(s). College Republicans agrees to provide all unaltered by laws and guiding documents and/or clarify its procedures in writing to any University of Florida student, faculty, or staff upon request.

ARTICLE VII. STUDENT ORGANIZATION ADVISOR

Each registered student organization must have an eligible student organization advisor. The student organization advisor must be a full-time, salaried faculty or staff member not on extended leave for 4 consecutive weeks or longer during their advisor term. The student organization advisor shall serve as a resource person providing advisory support to officers and members and may not vote or hold office in the organization.

Section A.

The Chairman shall appoint a Faculty Advisor to assist the Chairman in the planning of the club and the oversight of all club activities. His or her appointment shall be made by the first meeting of the Fall term.

Section B.

The Faculty Advisor will serve a one-year term but the same person can serve an unlimited number of terms.

Section C.

If the Faculty Advisor can no longer fulfill his or her duties, then the Chairman shall appoint a replacement Faculty Advisor with all expedience.

ARTICLE VIII. OFFICERS

Registered student organizations are required to have a minimum of a President, Treasurer, and Vice President as elected officers. These officers must abide by the Registered Student Organization Classification and Officer Eligibility Policy.

The elected officers of College Republicans shall be President, Vice-President, and Treasurer. At no time should one person hold more than one of these positions.

Section A.

The titles of Chairman, Vice-Chairman, and Treasurer and Secretary are to be elected through a majority vote.  The Chairman may also be referred to as "President"; however, the official title is "Chairman." The Vice-Chairman may also be referred to as "Vice-Chair," and "Vice-President"; however, the official title is "Vice-Chairman." These officers serve as the ruling body of the organization, called the Executive Board. The Executive Board shall oversee the Cabinet, which includes all elected positions, and the general members.

Section B.

The terms of all elected officers are to last one calendar year (The Fall semester through the Spring semester), after which all eligible officers shall be allowed to run again for office until they are no longer eligible vis-à-vis Registered Student Organization Classification and Officer Eligibility Policy.

Section C.

All elected officers of the College Republicans may be removed through a 75% majority vote, which must include two commanding officers in order for the removal to be validated.

Section D.

If an officer vacates his or her office, has expressed plans to vacate his or her office, is impeached, or is graduating before the end of his or her term in office, a special election must be held.

Part 1: The procedures and rules outlined in Article IX. Section C of this article hold true for special elections.

Part 2: All procedures and rules outlined in Article IX. Section B of this article hold true for special elections except that the elections meeting will be counted towards the attendance of a member, allowing for their status of Active Member to arise.

Part 3: As it relates exclusively to special elections, Section A is null and must be disregarded. Instead, a special election must take place within thirty days of the officers vacancy. The date of nominations for the election and the date of the election itself must be announced to the membership.

ARTICLE IX. ELECTIONS

Section A.

The nominations for each office will occur at a duly called meeting in the month of April at least two weeks prior to the election meeting. The election meeting will be a duly called meeting in the month of April and will be the final meeting of the Spring semester in each academic year.

Section B.

Only active members are eligible to be nominated for and elected to office. Eligibility to nominate and be nominated will be determined at the nominations meeting, which does count towards eligibility to nominate and be nominated.

Part 1: Additionally, prospective candidates for office must also meet university requirements for club officers. Those requirements must be announced by the chairman no later than at the nominations meeting.

Part 2: The nominations meeting will count toward the 50% of meetings threshold required to be an active member, but the elections meeting will not.

Part 3: In order to nominate an active member for Chairman, a nominator must be an active member in the semester the nomination would take place as well as in the prior semester.

Part 4: In order to be nominated for Chairman, an active member needs to have been active in the semester the nomination takes place as well as the prior semester.

Part 5: Nominations for candidates for club officer positions are made from the floor by any active members as determined by the Constitution.

Part 6: Once nominations have been made and the floor closed to nominations, the Secretary will notify all club members, no later than seven days before the election date, as to all the candidates.

Section C.

Officers shall be elected by a majority vote of those active club members present as determined by the Constitution. No proxy votes are allowed. The election shall be by secret ballot.

Part 1: Elections shall be presided over by the highest ranking officer not running for a position. If all officers are involved in the race, the Chairman will appoint two active members not involved in the elections to preside over the elections.

Part 2: Each candidate will give a speech not in excess of five minutes and then the vote will be taken.

Part 3: The order of election of officers shall be: Chairman, Vice-Chairman, Treasurer, and Secretary.

Part 4 The announcement of each result shall be announced prior to the election of the subsequent officer.

Part 5: All ballots shall be counted aloud for all club members to witness.

Part 6: A candidate must receive a majority of the vote in order to be elected. In the event of a runoff, the candidate with the lowest share of the vote is eliminated. The voting period reopens for the position. The process must be repeated until a candidate with a majority of the vote share emerges.

Part 7: In the event of a tie, a recast of ballots shall then take place.

Part 8: Any candidate can appeal a decision at the time of announcement and an immediate recount will ensue. The decision is final based on the recount of ballots.

In the absence of clear direction on election, amendment, and /or voting procedures, the College Republicans agree to follow the guidance and instruction of Robert's Rules of Order for the election or amendment process.

ARTICLE X. FINANCE

As a General Registered Student Organization, the College Republicans does not receive any funding or resources from other UF Departments or Colleges, rather, this organization is funded by general fundraising that will be undertaken by the members of the College Republicans

Section A.

The College Republicans will not require a membership fee per semester. Fundraising through various events such as will cover the cost of printing media (fliers, brochures, etc.), applying and registering for conventions, registrations pertaining to the club that may require such funding, or general club activities. Elected officials as well as active members will be expected to participate in any fundraising events that the College Republicans conduct.

Section B.

The College Republicans will utilize Student Government funding for certain events that require substantial financial costs.  If resources are not available, the College Republicans may seek financing from third-party options.

ARTICLE XI. DISSOLUTION OF ORGANIZATION

 Upon dissolution, student organizations are prohibited from leaving their organizational assets to any individual or any other student organization. Rather, student organizations may designate a specific charity that will receive such organizational assets. At the time of dissolution, after all outstanding debts are paid, the College Republicans will leave any assets and outstanding funds to the College Republican National Committee.

ARTICLE XII. AMENDMENTS TO CONSTITUTION

Student Engagement has established a process through which constitutions may be amended, reviewed, and approved. Student organizations wishing to amend their constitutions must utilize their constitution on file listed on GatorConnect to make amendments and submit those changes to Student Engagement.

Section A.

Any active member may bring forth a statement of some conviction that they feel the club should share. The resolution will be adopted by a simple majority of the present active members and kept in the permanent club files maintained by the Secretary.

Section B.

All active members may propose amendments to this Constitution by presenting the amendment to the Executive Board at least two weeks before the member intends to bring the amendment to the floor. The Chairman will bring the amendment to the floor and debate will begin with the Chairman being the

moderator of debate following Robert's Rules of Order. An amendment shall be adopted upon an affirmative vote of two-thirds of the active membership present through secret ballot. Upon passage, the Secretary will make the proper correction to the Constitution. Only a two-thirds vote of the present active membership, through secret ballot, can nullify this Constitution.

All amended constitutions must be submitted directly to Student Engagement for review and approval.

College Democrats

Constitution
Ratified on December 18th, 2024

## ARTICLE I. NAME OF ORGANIZATION

The name of this organization is College Democrats. College Democrats is affiliated with the Florida College Democrats. College Democrats will use the acronym UFCD.

## ARTICLE II. ORGANIZATION AFFILIATION

As outlined in the RSO Classification Policy, College Democrats is considered a General Registered Student Organization. As a GRSO, our organization is a separate 3rd party entity, not considered a part of the University of Florida. Through registering with the University, our student group agrees to follow its policies and operate on campus with access and/or eligibility for specific campus benefits.

## ARTICLE III. PURPOSE STATEMENT

The purpose of College Democrats shall be to stimulate political thought and activity among the students of the University of Florida, promote interest in public affairs, and further the philosophy and goals of the Democratic Party. As citizens and leaders of tomorrow, we share a Democratic vision of the future where there is economic opportunity for all, where minorities are given the same rights as the majority, and where the government serves the benefit of every person. We will strive for a government that ensures every citizen the right to a quality education, a clean environment, and the unimpeded opportunity to pursue their dreams regardless of sex, race, religion, disability, gender identity or sexual orientation. Under these principles, we hereby form College Democrats at the University of Florida.

## ARTICLE IV. COMPLIANCE STATEMENT & UNIVERSITY REGULATIONS

Upon approval by the Department of Student Engagement, College Democrats shall be a registered student organization at the University of Florida. College Democrats shall comply with all local, state and federal laws, as well as all University of Florida regulations, policies, and procedures. Such compliance includes but is not limited to the University's regulations related to Non-Discrimination, Sexual Harassment (including sexual misconduct, dating violence, domestic violence, and stalking), Hazing, Commercial Activity, and Student Leader Eligibility.

Section A. Non-Discrimination

College Democrats agrees that it will not discriminate on the basis of race, creed, color, religion, age, disability, sex, sexual orientation, gender identity and expression, marital status, national origin, political opinions or affiliations, genetic information and veteran status as protected under the Vietnam Era Veterans' Readjustment Assistance Act. Discrimination on the basis of the protected classes described in University of Florida Regulation 1.006 (Non-Discrimination/Harassment/Invasion of Privacy Policies) is prohibited.

Section B. Sexual Harassment

College Democrats agrees that it will not engage in any activity that is unwelcome conduct of sexual nature that creates a hostile environment. Behaviors that could create a hostile environment include sexual harassment (which could include inappropriate sexual comments), sexual misconduct, dating violence,

domestic violence, and stalking and repeated instances of cyber abuse. Sexual harassment as described in University of Florida Regulation 1.006 (Non-Discrimination/Harassment/Invasion of Privacy Policy) is prohibited.

Section C. Hazing

College Democrats agrees that it will not initiate, support, or encourage any events or situations that recklessly, by design, or intentionally endanger the mental or physical health or safety of a student for any purpose including but not limited to initiation or admission into or affiliation with any student group or organization. Hazing as defined in the University of Florida Regulation 1.0081 (Prohibition of Hazing; Procedures and Penalties) and 4.040 (Student Honor Code and Student Conduct Code) is prohibited. If found responsible for hazing, sanctions may be imposed against the organization, its leaders and/or members.

Section D. Responsibility to Report

The University of Florida identifies Responsible Employees and Campus Security Authorities to support the health, safety, and wellbeing of campus. If College Democrats becomes aware of any such conduct described in this article, they are encouraged to report it immediately to staff in Student Engagement, the Director of Student Conduct and Conflict Resolution, the University's Title IX Coordinator, or to their Student Organization Advisor, who are identified as mandated reporters.

Section E. Officer Eligibility

College Democrats understands, acknowledges, and agrees to uphold and abide by the specific minimal requirements regarding officer eligibility as defined in the Registered Student Organization Classification and Officer Eligibility Policy.

## ARTICLE V. MEMBERSHIP

Membership in this organization is open to all enrolled students at the University of Florida. Non-enrolled students, spouses, faculty, and staff are prohibited from holding membership, office or voting powers. All members are free to leave and disassociate without fear of retribution, retaliation, or harassment.

## ARTICLE VI. BYLAWS FOR College Democrats

College Democrats may elect to maintain separate bylaws document to outline the day-to-day operations of the organization and to clarify policies and procedures otherwise not included in the previous articles. Bylaws and/or other guiding documents may not take precedence over the requirements sent forth by local, state, and federal laws, the university of Florida's regulations, policies, and procedures, and the Student Engagement constitution requirements. Amendments and changes may be made to the bylaws and shall be consistent with the Student Engagement approved constitution on file and student engagement's constitution requirements. Should the organization transition leadership, all bylaws and guiding documents will be transitioned to new student organization leaders and/or advisor(s). College Democrats agrees to provide all unaltered by laws and guiding documents and/or clarify its procedures in writing to any University of Florida student, faculty, or staff upon request.

## ARTICLE VII. STUDENT ORGANIZATION ADVISOR

Each registered student organization must have an eligible student organization advisor. The student organization advisor must be a full-time, salaried faculty or staff member not on extended leave for 4 consecutive weeks or longer during their advisor term. The student organization advisor shall serve as a

resource person providing advisory support to officers and members and may not vote or hold office in the organization.

Section A. Advisor Selection Method And Margin of Selection

College Democrats' Faculty Advisor will be chosen by the President. The President's choice for Faculty Advisor must be voted on the Executive Board. A simple majority of approval by the Executive Board is required to confirm the President's recommended candidate for Faculty Advisor.

Section B. Term Length Of Faculty Advisor

College Democrats' Faculty Advisor will have a term of office of one year with the opportunity to be reappointed.

Section C. Process For Replacing Faculty Advisor

The President may initiate a vote among the executive board of the College Democrats to remove the Faculty Advisor. A simple majority approving the President's initiative is required to approve the removal of the Faculty Advisor.

## ARTICLE VIII. OFFICERS

Registered student organizations are required to have a minimum of a President, Treasurer, and Vice President as elected officers. These officers must abide by the Registered Student Organization Classification and Officer Eligibility Policy.

The elected officers of College Democrats shall be President, Vice-President, and Treasurer. At no time should one person hold more than one of these positions

Section A. Elected Officers

College Democrats' Elected Officers are as follows:

- President
- Vice President
- Treasurer
- Political Director
- Organizing Director
- Marketing Director
- Public Relations Director
- Programs Director
- Internal Affairs Director
- Digital Organizing Director
- Membership Director

Section B. Appointed Officers

College Democrats' Appointed Officers are as follows:

- Logistics Coordinator
- Recruitment Coordinator

- Membership Coordinator
- Mutual Aid Coordinator
- Fundraising Coordinator
- Electoral Coordinator
- Organizing Coordinator
- Photography Coordinator
- Graphics Coordinator
- Social Coordinator
- Caucus Chair

Section C. Term Of Office

All officers in College Democrats' serve in their position for a term of one academic year, with no limits to the number of terms an officer may serve in their respective position.

Section D. Impeachment And Removal Process For Elected Officers

A. Any active member, with the sponsorship of a voting member of the executive board, may propose the removal of an elected officer to the Executive Board in the event of an elected officer failing to fulfill their duties or willfully acting to the detriment of the organization.

B. Following receipt of a sponsored petition for removal of an executive board member, the officer may be removed from office by a two-thirds vote of the Executive Board.

C. If a majority is reached, but by less than two-thirds, then the proposal must be brought before the general body.

D. If brought before the general body, intention of removal must be submitted to the general body at least one week prior to the vote.

E. If a majority of paid-general body members present at the meeting reach a vote in favor of removal, then the officer is removed.

F. The President may appoint an interim officer, subject to confirmation by a majority of voting members of the executive board, to serve in the vacated position until an election may be held.

Section E. Impeachment And Removal Process For Appointed Officers

A. Any active member, with the sponsorship of a voting member of the executive board, may propose the removal of an appointed officer to the Executive Board in the event of an appointed officer failing to fulfill their duties or willfully acting to the detriment of the organization.

B. Following receipt of a sponsored petition for removal of an appointed officer, the officer may be removed from office by a majority vote of the Executive Board.

Section F. Vacancies Procedures For Elected Officers Other Than President

A. If a member of the executive board other than the president vacates their position before the expiration of their term, the President may appoint an interim officer, subject to confirmation by a majority of the voting members of the executive board, to serve in the vacated position until an election may be held.

B. Interim members of the board may vote on executive board business until a replacement is elected.
C. The Executive Board must schedule a special election within two general body meetings of any vacancy.

Section G. Vacancy Procedures For President

A. If the President vacates their position before the expiration of their arm, the Vice President shall become Acting President. The Acting President must then appoint a new acting Vice President. The Acting President must then organize new elections among the general body for the positions of President and Vice President within two general body meetings.
B. If both the President and Vice President vacate their positions, the Treasurer shall become Acting President.
C. If the President, Vice President, and Treasurer all vacate their positions, the Political Director is next in the line of succession to become Acting President, followed by the Public Relations Director, Marketing Director, Organizing Director, Programs Director, and Internal Affairs Director, in that order.

Section E. Vacancies For Appointed Positions

A. If an appointed officer vacates their position, the President may recommend another member to be appointed to that position upon confirmation by a majority vote of the executive board. The President may also at their own discretion leave the appointed position vacant for the rest of the term.

## ARTICLE IX. ELECTIONS

Section A. Eligibility

A. Individuals holding office must meet the University of Florida's criteria for officers of student organizations. Individuals holding office must be paid members of the College Democrats.

Section B. Nomination Procedures

A. Individuals can nominate themselves or others for elected positions by emailing the President, at president@ufdemocrats.org, with the name of the individual and the position they are nominating them for. This must be done at least by the Sunday before the election.

Section C. Election Timeline

A. General Body Members will be asked to start submitting nominations for Executive Board Elections by the last General Body Meeting in March.
B. The nominating period will last until the Sunday before the last General Body Meeting in the Spring semester.
C. The last General Body Meeting of the Spring Semester will be when officer elections are held.

Section D. Balloting Procedures

A. Voting will be conducted in person at the last General Body meeting of the Spring Semester. The President will be responsible for managing every election.
B. Voting will be done by eligible voting members raising their hands for their candidate when called upon. The President will count the votes, and the Vice President must agree that the vote count is accurate for the election to be certified.

C. If the President cannot be present at the Election, the Vice President will be responsible for managing the elections. If the Vice President is also not able to be present, the Treasurer will manage the elections.

Section E. Election Rules And Procedures

A. The President will immediately announce the winner of every election after counting the votes and receiving the Vice President's confirmation of the vote count.
B. Every executive board election requires a candidate to win a simple majority to win the election.
C. In the event of a tie, all candidates except the two vote-earners will move to an immediate run-off among the eligible voting members. In the event of a tie between two candidates, the previous years' executive board will vote again to break the tie.

Section F. Eligible Voting Members

A. All members of the College Democrats General Body who have paid membership dues are eligible to vote at officer elections. Members of the General Body who have not paid membership dues are not eligible to vote at officer elections for the College Democrats.

Section G. Election of the President, Vice President, and Treasurer

A. The election for the President shall be presided over by the Vice President, with the Treasurer certifying that the Vice President's count of the votes is accurate.
B. The election of the Vice President shall be presided over by the President, with the Treasurer certifying that the President's count of the votes is accurate.
C. The election of the Treasurer shall be presided over by the President, with the Vice President certifying that the President's count of the votes is accurate.
D. The President's election shall be held first, followed by the Vice President, followed by the Treasurers. The President may then decide at their own discretion the order of the next elections.

In the absence of clear direction on election, amendment, and /or voting procedures, College Democrats agrees to follow the guidance and instruction of Robert's Rules of Order for the election or amendment process.

## ARTICLE X. FINANCE

As a General Registered Student Organization, College Democrats does not receive any funding or resources from other UF Departments or Colleges, rather, this organization is funded by : membership dues.

Membership dues are $20 for just the Fall semester, $30 for the whole academic year, with $40 memberships available for additional benefits. Payment is due once a year either upon taking up an elected or appointed position or by the last General Body Meeting in September.

## ARTICLE XI. DISSOLUTION OF ORGANIZATION

Upon dissolution, student organizations are prohibited from leaving their organizational assets to any individual or any other student organization. Rather, student organizations may designate a specific charity that will receive such organizational assets. At the time of dissolution, after all outstanding debts are paid, College Democrats will leave any assets and outstanding funds to the Florida College Democrats.

## ARTICLE XII: AMENDMENTS TO CONSTITUTION

Student Engagement has established a process through which constitutions may be amended, reviewed, and approved. Student organizations wishing to amend their constitutions must utilize their constitution on file listed on GatorConnect to make amendments and submit those changes to Student Engagement.

Section A. Proposal Procedure

Amendments may be proposed by any elected or appointed officer. Additionally, any paid member may submit proposed amendments to the Executive Board. If three members of the Executive Board, including the President, approve the language and content of the proposed amendment it will be brought to a vote before the executive board.

Section B.  Ratification Procedure

Amendments proposed by the Executive Board shall be ratified by a two-thirds vote of the executive board. Amendments proposed by the General Body, upon receiving approval from three executive board members including the President, may be voted on by all paid members, with a 2/3rds majority vote required by all present paid voting members in order to ratify an amendment proposed by the General Body.

All amended constitutions must be submitted directly to Student Engagement for review and approval.

**Declaration Evan Power**

1.      I, Evan Power, declare the following:

2.      I am over the age of eighteen and make this statement based on my personal knowledge. I am competent to testify to the matters stated herein.

3.      I am the Chairman of the Republican Party of Florida ("RPOF") and have served in that role for more than two years.

4.      The State Executive Committee of the RPOF acting through its internal party rules, is the only entity that has the ability to grant permission to a person or group of persons to use the name "Republican" under section 103.081(2), Florida Statutes.

5.      The Florida Federation of College Republicans ("FFCR) has been granted permission as a chartered organization to use the name "Republican" by the RPOF in accordance with its internal rules. That charter does not include a delegation of authority to enforce the rules of the party regarding what person or group of persons are permitted to use the "Republican" name. Such authority belongs solely to the RPOF.

In accordance with 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Evan Power

Date: 4.6.2026

1

## DECLARATION OF UFCR PRESIDENT MICHAEL ANDRE          EX. 4

1.     I, Michael Andre, declare the following:

2.     I am over the age of eighteen and make this statement based on my personal knowledge. I am competent to testify to the matters stated herein.

3.     I am the Chairman of the UF College Republicans ("UFCR") and have served in that role for more than two years.

4.     The UFCR is not, and has never been a member of, or affiliated with, the Florida Federation of College Republicans ("FFCR").

5.     Further, the FFCR is not a "parent organization" of UFCR and has no authority over our organization.  At most, it is an independent social club, composed of other college republicans from other parts of the state, that we interacted with sporadically.

6.     Last Fall, the President, Angel Aguilar requested for us to join their group; we emphatically rejected that offer.  After we rejected the invitation to join, Aguilar then, without permission, sent a letter to UF falsely claiming we are affiliated with them.

7.     Since that time, Aguilar has attempted to work with UF to shut us down based on our conservative viewpoints, which he disagrees with. When UF finally did deactivate us, it did so with no notice given to our organization, which clearly shows enormous bias against our viewpoint.

8.     There is no mention of FFCR in our UFCR Constitution.  They are an irrelevant group with no authority or importance, that UF conveniently used to orchestrate our removal.

<u>In accordance with 28 U.S. Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.</u>

*/s/ Michael Andre*
Michael Andre
4.6.2026

1